# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

|  |  |
|---|---|
| WILLOW INNOVATIONS, INC. | |
| *Plaintiff,* | |
| v. | Civil Action No. 2:23-cv-00229-JRG |
| CHIARO TECHNOLOGY LTD., | **JURY TRIAL DEMANDED** |
| *Defendant.* | |

## PLAINTIFF WILLOW'S OPENING CLAIM CONSTRUCTION BRIEF

# TABLE OF CONTENTS

Page

I.  LEGAL STANDARDS ................................................................................ 2

II. CONSTRUCTION OF TERMS COMMON TO MULTIPLE PATENTS ....................... 3

  A.  "a pump mechanism" ('229 Patent, claim 1) / "a pumping mechanism" ('816 Patent, claim 1; '624 Patent, claim 1; '005 Patent, claim 1) / "a vacuum pumping mechanism" ('619 Patent, Claim 1) ............................................................ 3

    1.  "pump mechanism" should be given a plain and ordinary meaning .............. 3

    2.  "pump mechanism" is not subject to § 112(f) ........................................ 4

    3.  Intrinsic evidence does not support Elvie's construction ................................. 5

    4.  Extrinsic evidence does not support Elvie's construction ................................. 6

  B.  "the suction force and the milk flow path both being directed generally upward relative to the bottom portion of the flange" ('816 Patent, claim 1) / "milk extracted from the breast flows to the collection container upwardly through the milk flow path relative to a bottom of the breast contacting structure" ('228 Patent, claim 11) ................................................................................ 9

  C.  "contained within" ('624 Patent, claim 1; '619 Patent, claim 1; '229 Patent, claim 1) / "contained completely within" ('816 Patent, claim 1) ................................... 12

III. CONSTRUCTION OF '005 PATENT CLAIM TERMS ....................................... 13

  A.  "pump mechanism comprises two drivers that displace a flexible member to generate vacuum pressure." ('005 Patent, Claim 1) ............................................. 13

  B.  "the wireless transmitter transits pumped milk volume to the external device which displays the pumped milk volume of each breast" ('005 Patent, claim 1) . 14

  C.  "the breast pump automatically senses letdown" ('005 Patent, claim 2) .............. 15

  D.  "chassis" ('005 Patent, claim 1) ....................................................................... 16

IV. CONSTRUCTION OF '619 PATENT CLAIM TERMS ....................................... 17

  A.  "the non-contact pressure sensor adjacent the nipple receiving portion" ('619 Patent, claim 1) ............................................................................................. 17

V.  CONSTRUCTION OF '816 PATENT CLAIM TERMS ....................................... 18

  A.  "the pumping mechanism is associated with the rigid nipple receiving portion" ('816 Patent, claim 1) ...................................................................................... 18

VI. CONSTRUCTION OF '229 PATENT CLAIM TERMS ....................................... 20

  A.  "a latch suction is maintained throughout the pumping session" ('229 Patent, claim 1) ........................................................................................................... 20

  B.  "the milk collection container is configured about the pump mechanism" ('229 Patent, claim 5) / "the milk collection container is configured adjacent the pump mechanism" ('229 Patent, claim 9) ................................................................. 21

VII. CONSTRUCTION OF 'D995 PATENT CLAIM TERMS ..................................... 22

  A.  "The ornamental design for a breast pump, as shown and described" ................ 22

**TABLE OF CONTENTS**
**(continued)**

**Page**

1.  *The claimed features are ornamental, not functional, and thus require no verbal description* ........................................................................ 23

2.  *Elvie's proposed verbal description interjects ambiguity and is unhelpful to the Court or jury* ....................................................................... 24

3.  *The drawings describe the scope of the design with reasonable certainty* ..... 27

VIII.  CONSTRUCTION OF 'D625 PATENT CLAIM TERMS ............................................. 30

A.  "The ornamental design for a breast pump, as shown and described" ................ 30

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
   805 F.3d 1368 (Fed. Cir. 2015) ................................................................. 2

*Arlington Industries, Inc. v. Bridgeport Fittings, Inc.*,
   632 F.3d 1246 (Fed. Cir. 2011) ............................................................... 16

*Cywee Grp., Ltd. v. Huawei Device Co.*,
   No. 2:17-cv-00495-WCB-RSP, 2018 WL 6419484 (E.D. Tex. Dec. 6, 2018) ..................... 18

*Egyptian Goddess, Inc. v. Swisa, Inc.*,
   543 F.3d 665 (Fed. Cir. 2008) ............................................................... 22

*Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*,
   796 F.3d 1312 (Fed. Cir. 2015) ......................................................... 23, 24

*Greenberg v. Ethicon Endo–Surgery, Inc.*,
   91 F.3d 1580 (Fed. Cir. 1996) ................................................................ 4

*Huawei Techs. Co. Ltd. v. Verizon Commcn's, Inc.*,
   2021 WL 150442 (E.D. Tex. Jan. 15, 2021) .................................................. 4

*In re Maatita*,
   900 F.3d 1369 (Fed. Cir. 2018) ......................................................... 27, 29

*Joao Control & Monitoring Sys., LLC v. Protect Am., Inc.*,
   No. 1-14-CV-134-LY, 2015 WL 4937464 (W.D. Tex. Aug. 18, 2015) ............................. 19

*MBO Labs. Inc. v. Becton, Dickinson & Co.*,
   474 F.3d 1323 (Fed. Cir. 2007) ............................................................... 5

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
   572 U.S. 898 S. Ct. 2120, 189 L. Ed. 2d 37 (2014) ......................................... 2, 3

*Nystrom v. TREX Co.*,
   424 F.3d 1136 (Fed. Cir. 2005) ............................................................. 11

*Pavo Sols. LLC v. Kingston Tech. Co., Inc.*,
   35 F.4th 1367 (Fed. Cir. 2022) ............................................................. 14

*Rembrandt Wireless Techs., LP v. Samsung Elecs. Co.*,
   No. 2:13-CV-213-JRG-RSP, 2014 WL 3385125 (E.D. Tex. July 10, 2014) ....................... 8

*RightQuestion, LLC v. Samsung Elecs. Co., Ltd.*,
   2:21-CV-00238-JRG, 2022 WL 1154611 (E.D. Tex. Apr. 18, 2022) ............................. 6

*Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*,
   948 F.3d 1342 (Fed. Cir. 2020) ............................................................... 2

*Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*,
   844 F.3d 1370 (Fed. Cir. 2017) ............................................................... 3

*SpaceTime3D, Inc. v. Samsung Elecs. Co.*,
   No. 2:19-cv-00372-JRG, 2020 WL 7183538 (E.D. Tex. Dec. 7, 2020) ......................... 12

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Sport Dimension, Inc. v. Coleman Co.*,
  820 F.3d 1316 (Fed. Cir. 2016) ............................................................................ 24

*Thorner v. Sony Comput. Ent'mt Am. LLC*,
  669 F.3d 1362 (Fed. Cir. 2012) ............................................................................. 2

*TriMed, Inc. v. Stryker Corp.*,
  514 F.3d 1256 (Fed. Cir. 2008) ............................................................................. 5

*Wasica Fin. GMBH v. Cont'l Auto. Sys., Inc.*,
  853 F.3d 1272 (Fed. Cir. 2017) ........................................................................... 18

*Williamson v. Citrix Online LLC*,
  792 F.3d 1339 (Fed. Cir. 2015) ........................................................................ 2, 4

**Other Authorities**

https://www.merriam-webster.com/dictionary/contain ............................................. 13

https://www.merriam-webster.com/dictionary/enclosed .......................................... 12

https://www.merriam-webster.com/dictionary/oval ................................................. 25

Willow's revolutionary wearable, in-bra breast pump technology, embodied in six utility patents and two design patents, recite straightforward claim terms well understood to a person skilled in the art. Elvie, however, through a variety of missteps, improperly tries to import a single embodiment disclosed in the specification—a "peristaltic" pump—to narrow Willow's claims unjustly. The claims are not so limited, and the entirety of the intrinsic and extrinsic evidence shows that the claims cover the limited universe of different types of breast pump mechanisms that both parties agree were well understood by a POSA at the time of the invention.

Elvie attempts to limit Willow's claims to one very specific type of pump mechanism, a so-called peristaltic-type pump, which necessarily includes both a compressible tube and actuators. But the words "peristaltic," "compressible tube," and "actuators" do not even meaningfully appear in any of Willow's claims, specifications, or prosecution histories, so the basis for Elvie's construction comes through extrinsic evidence. First in the form of the Declaration of Robert Stone, where he relies on an excerpt from a single Willow inventor's lab notebook identifying "peristaltic" pumps as one type of pump mechanism. With that in hand, Dr. Stone then picks and chooses specific figures and corresponding disclosures from the specification while ignoring the specifications' clear teachings as to other types of pump mechanisms. At his deposition, Dr. Stone admitted that (1) he did not cite to or rely on certain teachings in the specifications, (2) he failed to review other inventors' lab notebooks (which describe other types of pumps), and (3) he did not cite to the prosecution history for any disclaimer or disavowal of claim scope that would limit the broader independent claims to a peristaltic-type pump only.

Moreover, Dr. Stone, who said that he came up with the means-plus-function analysis for the claim term "pump mechanism," admitted that his own opinions were flawed and

inconsistent with the specifications and claim language. As addressed in more detail below, he also provided definitions that were either redundant, interjected ambiguity, or violated basic tenets of claim construction. At bottom, this is a case that demonstrates there is a high burden in relying on contrived extrinsic evidence in going against the rules and conventions governed by uncontroverted intrinsic evidence.

## I.    LEGAL STANDARDS

"The words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art." *Thorner v. Sony Comput. Ent'mt Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term." *Id*. "[E]ven where a patent describes only a single embodiment, claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 805 F.3d 1368, 1376 (Fed. Cir. 2015).

"[T]he failure to use the word 'means' … creates a rebuttable presumption … that § 112[f] does not apply." *Williamson v. Citrix Online LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (citations and internal quotation marks omitted). "The question whether [a term] invokes section 112[f] … depends on whether persons skilled in the art would understand the claim language to refer to structure, assessed in light of the presumption that flows from the drafter's choice not to employ the word 'means.'" *Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*, 948 F.3d 1342, 1354 (Fed. Cir. 2020).

Claims are invalid as indefinite only if they "fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901, 134 S. Ct. 2120, 2124, 189 L. Ed. 2d 37 (2014). "A patent must be

precise enough to afford clear notice of what is claimed," but that consideration must be made while accounting for the inherent limitations of language. *Id*. at 908-09. "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

## II.    CONSTRUCTION OF TERMS COMMON TO MULTIPLE PATENTS[1]

### A.    "a pump mechanism" ('229 Patent, claim 1) / "a pumping mechanism" ('816 Patent, claim 1; '624 Patent, claim 1; '005 Patent, claim 1) / "a vacuum pumping mechanism" ('619 Patent, Claim 1)

| Willow's Proposed Construction | Elvie's Proposed Construction |
|---|---|
| Not governed by 35 U.S.C. § 112(f); no construction necessary / plain and ordinary meaning<br>**Alternatively:**<br>**Function:**<br>"pumping" / "vacuum pumping" / "pump"<br>**Structure:**<br>"one or more pumps," or equivalents thereof. | Means-plus-function<br>Function: "creating a suction force to pump milk"<br>Structure: "actuators and a compressible tube that direct milk generally upward and away from the lower end of the flange when the breast pump is upright" |

### *1.    "pump mechanism" should be given a plain and ordinary meaning*

The terms "pump mechanism," "pumping mechanism," and "vacuum pumping mechanism," despite their various gradations and contexts, can be used interchangeably (Ex. K, Stone Dep. Tr. at 94:13-95:2), and should be construed according to a plain and ordinary meaning to cover "a pump," including a volume shape that can be changed or compressed to pump milk from a human breast. The claims themselves are clear—they are referring to a "pump" within the context of a wearable breast pump. Willow's specifications support this construction and provide that "reference to 'the pump' includes reference to one or more pumps and equivalents thereof known to those skilled in the art." Ex. D, '624 Patent at 10:34-36. Dr. Stone admitted at

---

[1] Herein, "Willow's Asserted Patents" refer collectively to U.S. Patent Nos. 10,398,816 ("the '816 Patent"), 10,434,228 ("the '228 Patent"), 10,625,005 ("the '005 Patent"), 10,722,624 ("the '624 Patent"), 11,185,619 ("the '619 Patent"), 10,688,229 ("the '229 Patent"), U.S. Design Patent No. D832,995 ("the 'D995 Patent"), and U.S. Design Patent No. D977,625 ("the 'D625 Patent").

his deposition that consistent with the specification, pump designs are well known to those skilled in the art—they are "limited" in type, "their applications are well known to a POSA," and may include for example, diaphragm, piston, and peristaltic pumps. Ex. K at 107:12-108:15. The Court should reject Elvie's attempt to limit Willow's generic "pump mechanism" to a "peristaltic" pump only, when other types of pumps are both claimed and described in the intrinsic and extrinsic evidence.

### 2. *"pump mechanism" is not subject to § 112(f)*

A "pump mechanism" contains sufficient structure (i.e., a pump) that does not invoke means-plus-function. Where, as here, the claims do not recite the word "means," "there is a rebuttable presumption that … [§ 112(f)] does not apply." *Huawei Techs. Co. Ltd. v. Verizon Commcn's, Inc.*, 2021 WL 150442, at *4 (E.D. Tex. Jan. 15, 2021). Elvie does not overcome this presumption because it cannot "demonstrate that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Williamson*, 792 F.3d at 1348 (en banc in relevant portion) (internal quotations omitted).

In *Greenberg v. Ethicon Endo–Surgery, Inc.*, the Federal Circuit held that the term "detent mechanism" was not a means-plus-function term because "'detent' denotes a type of device with a generally understood meaning in the mechanical arts, even though the definitions are expressed in functional terms." 91 F.3d 1580, 1583 (Fed. Cir. 1996). Indeed, "[m]any devices take their names from the functions they perform," including "filter," "brake," "clamp" "screwdriver," and "lock." *Id*. The court held that § 112(f) is not invoked where "the term, as the name for structure, has a reasonably well understood meaning in the art." *Id*. Here, "pump" and "vacuum pump" are commonplace structural terms, and they are not subject to § 112(f) merely because they are recited alongside "mechanism."

4

Indeed, Elvie's expert, Dr. Stone, testified that a POSA would understand that a "pump mechanism" refers to a "pump." Ex. K at 107:2-10. Dr. Stone further admitted that a limited number of pumps were known in the art (including diaphragm, piston, and peristaltic pumps). *Id.* at 107:12-108:15; Ex. I, Stone Decl. ¶ 23. Dr. Stone's admissions are sufficient to find that "pump mechanism," "pumping mechanism," and "vacuum pumping mechanism" recite sufficiently definite structure to avoid § 112(f). *See TriMed, Inc. v. Stryker Corp.*, 514 F.3d 1256, 1259-60 (Fed. Cir. 2008).

In addition, Elvie's means-plus-function argument is belied by its own position taken before the Patent Office during prosecution of its asserted '151 Patent. The examiner found that the '151 Patent claim term "***mechanism*** that releasably attaches or latches …" was in means-plus-function format governed by § 112(f). Ex. M at 17.[2] To avoid a means plus function construction, Elvie amended the claim to recite a "***mechanical or magnetic*** mechanism … ," and argued that amending the claim to add ***mechanical or magnetic*** to further modify mechanism does not invoke § 112(f). *Id.* at 7, 9. Thus, Elvie cannot credibly claim that a "pump mechanism" is governed by § 112(f), when "mechanical" or "magnetic" mechanism, which Dr. Stone admits conveys less specific structure than a pump (Ex. K at 103:15-105:1), is not.

### 3.    *Intrinsic evidence does not support Elvie's construction*

Elvie's intrinsic support for limiting Willow's claims to a "peristaltic pump" is scant and consists entirely of isolated figures and non-exclusive embodiments from various portions of the specifications. But even taking these disclosures on their face, Willow's "patent coverage is not necessarily limited to inventions that look like the ones in the figures." *MBO Labs. Inc. v. Becton,*

---

[2] All emphasis is added unless stated otherwise.

*Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007). None of Willow's asserted claims even mention the word "peristaltic" or recite an actuator or compressible tube.[3]

Turning to the prosecution history, Elvie has not made—and cannot make—any argument that Willow disclaimed other types of pumps or their corresponding structures. Indeed, Dr. Stone recognized that while the examiner cited prior art diaphragm pump technology as relevant to Willow's claims, Dr. Stone does not—because he cannot—cite to one instance where Willow argued that its claims are limited to peristaltic pumps. Ex. K at 48:19-49:1, 113:11-17.

### 4. *Extrinsic evidence does not support Elvie's construction*

Elvie relies heavily on extrinsic evidence. And here, even if § 112(f) applies, which it should not, the Court should then find that the disclosed function is "'pumping' / 'vacuum pumping' / 'pump'" and the corresponding structure is "'one or more pumps,' or equivalents thereof." Elvie's extrinsic evidence is highly self-selected, and thus flawed, incomplete, or even contrary to Elvie's own position.

***First***, Elvie's expert, Dr. Stone, retracted his opinion, and stated that Elvie's proposed structure for Elvie's proposed definition is incorrect as incomplete because he omitted from his proposed definition the drivers (i.e., motors) driving the compression members to pump the volume in the pumping chamber. Ex. K at 135:9-136:16.

***Second***, Dr. Stone relies on the laboratory notebook of Dr. Joshua Makower, a named inventor on Willow's Asserted Patents.[4] But Dr. Stone testified that he reviewed only excerpts

---

[3] The only reference to "peristaltic" in Willow's Asserted Patents comes from the '624 and '229 Patents. Ex. D at 11:60-61 ("Examples of tubes 32 include, but are not limited to: silicone tubing, such as used in peristaltic pumps.").

[4] As an initial matter, Elvie's reliance on extraneous statements from lab notebooks is entitled to no weight when construing the claims. *RightQuestion, LLC v. Samsung Elecs. Co., Ltd.*, 2:21-CV-00238-JRG, 2022 WL 1154611, at *8 (E.D. Tex. Apr. 18, 2022) ("Short of clear and unambiguous lexicography … the applicant's intent about the meaning of the term is not relevant to its plain and ordinary meaning.").

from this one notebook and did not review any of the other inventors' lab notebooks. When he was asked why, he testified that's what was provided to him by his attorneys—and he did not care to request or review any of the other inventors' notebooks. *Id*. at 40:15-42:15. Tellingly, other inventors' lab notebooks disclose pump types other than peristaltic pumps, including a diaphragm-style pump, similar to those disclosed in the cited prior art as well as the pump that Elvie uses. Ex. N.

**Third**, Dr. Stone's myopic focus on disclosures related only to a peristaltic pump exclude express teachings in the specification of other types of pumps. His explanations during his deposition reveal the flawed methodology of picking and choosing from the specification. For example, Dr. Stone testified that although claim 11 of the '228 Patent does not even recite the term "pump mechanism" or a related term, he believes the claims are nevertheless limited to a peristaltic pump (i.e., a pump containing actuators and a compressible tube). Ex. K at 111:9-112:16.

Further, referring to Figure 4, the '005 Patent states that "although portions 32S and 32L [of flex-tube 32] are shown as tubular portions, ***the present disclosure is not limited to such, as one or both portions could be shaped otherwise***." Ex. C, '005 Patent at 9:49-52. Dr. Stone did not cite or discuss this passage in his declaration. Ex. I ¶¶ 53-70. When asked why, he stated "it's not relevant to what a peristaltic pump is." Ex. K at 118:3-16.

Similarly, while Dr. Stone improperly limits the scope of a "compression element" to a compressible "tube," he also cherry-picks figures from the specification that depict more than one "***actuator***" to opine that two or more actuators are required by the claims, even when the specifications disclose embodiments with just a *single actuator* (referred to as a "compression element" in the specifications). Ex. D at 19:1-3 ("FIGS 5A-5C illustrate operation of a system 100 having ***only one compression element 38*** according to an embodiment of the present disclosure.").

During his deposition, Dr. Stone confirmed that he focused on the disclosed embodiments to multiple compression elements while ignoring the teachings to a single compression element because a single compression element or actuator "would not be a peristaltic pump in my understanding of how peristaltic pumps work."  Ex. K at 130:2-131:1.  At his deposition, a clear pattern emerged: Dr. Stone relied only on self-selected portions of the specifications that support his conclusion limiting the claims to a peristaltic pump only—while ignoring the rest of the specifications' teachings, and other evidence which disclose other types of pump mechanisms covered by Willow's claims.

**Finally**, Dr. Stone's opinion further violates basic claim construction principles by importing unclaimed limitations and causing redundancies in the claims.  Elvie's proposed construction limits the structure to "actuators and a compressible tube that direct milk ***generally upward and away from the lower end of the flange when the breast pump is upright***."  But the bolded italicized phrase here mirrors Elvie's proposed claim construction for the "upward flow" limitations.  *See infra* § III.B.  The claims of the '229, '005, '624, and '619 Patents do not recite any aspect of upward flow, yet Dr. Stone's construction for "[pump / pumping] mechanism" and "vacuum pumping mechanism" would import the concept of an upward flow where none exists.  Also, Dr. Stone's proposal would result in "upward flow" being redundant in claim 1 of the '816 Patent, once through his proposed definition of "pump mechanism," and then again because the "upward flow" limitation is found expressly in the claim.  "Such redundancy is disfavored when construing claims."  *Rembrandt Wireless Techs., LP v. Samsung Elecs. Co.*, No. 2:13-CV-213-JRG-RSP, 2014 WL 3385125, at *5 (E.D. Tex. July 10, 2014).

**B.** **"the suction force and the milk flow path both being directed generally upward relative to the bottom portion of the flange" ('816 Patent, claim 1) / "milk extracted from the breast flows to the collection container upwardly through the milk flow path relative to a bottom of the breast contacting structure" ('228 Patent, claim 11)**

| Willow's Proposed Construction | Elvie's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "the suction force and the milk flow path both being directed generally upward and away from the lower end of the flange when upright"; Alternatively, indefinite. |

The limitations related to upward flow should be construed according to their plain and ordinary meaning, which merely requires that the suction force and the milk flow path (in claim 1 of the '816 Patent)—or "milk extracted from the breast" (in claim 11 of the '228 Patent)—flows upwardly or generally upward relative to the bottom portion of the flange. Elvie's proposed definition for these two terms merely reiterates the first part of the phrase, "the suction for and milk flow patent both being directed generally upward," but then either substitutes its own words for easily understood claim terms or imports limitations into the claim terms that are not there.

*First*, Elvie inserts the term "when upright," referring to the user's orientation during a pumping session. This imported limitation directly contradicts the specifications' clear teaching which informs a POSA that a user can be in many different orientations while pumping. Because the claims when read as a whole require the device to be "[in] use" (Ex. A, '816 Patent at 50:58-60), the patents teach a POSA that a user may pump in multiple, distinct positions, including positions that may *or may not* include "when upright," as interjected and understood by Dr. Stone:

> *[I]t allows breast milk to be extracted and collected over even an uphill gradient, such as may occur when **the user is lying down, bending over**, or in environments such as a bumpy ride, as in an automobile or airplane trip.*

Ex. B, '229 Patent at 32:31-35. While Dr. Stone does not dispute that a user can pump in non-upright positions, he contends that "when upright" is necessary to define the initial orientation to add definiteness to the claim. But that is wrong. In terms of "up and down," Dr. Stone relies on

*gravity*, but in relation to gravity is not how Willow claimed its invention.  When pressed, Dr. Stone acknowledged there is critical a difference between upward ***relative to the bottom of the flange***, as the claim term reads, on the one hand, and then upward ***relative to gravity***, which is not in the claim, on the other hand.  He finally conceded that, "up and down are ***relative terms related to gravity***, but the drawings relate instead to [an up and down] direction ***with regard to the bottom of the flange***." Ex. K at 55:9-19.  And that is how Willow chose to claim its invention—in relation to the bottom of the flange, and whether Dr. Stone agrees with it or not is immaterial.

The claims likewise require that the suction force and milk flow path (in the case of claim 1 of the '816 Patent) or the extracted milk (in the case of claim 11 of the '228 Patent) are directed upward ***relative to the bottom portion of the flange***.  Ex. A at 50:45-51:2; Ex. F, '228 Patent at 51:17-27.  Dr. Stone further admitted that the top and bottom of the device are always fixed—thus, the key reference point (i.e., bottom portion of the flange) remains fixed even if the user is pumping while lying on her back.  Ex. K at 76:2-20.

"When upright" is also wrong because it interjects ambiguity into an otherwise clear term.  Elvie's experts disagree as to the meaning of "when upright."  Elvie's design expert, Mr. Tim Fletcher, testified that "when upright" could refer to a range of semi-upright positions, including slightly leaning either backward or forward.  Ex. L, Fletcher Dep. Tr. at 157:8-159:2.  But Dr. Stone disagreed, and testified that "[i]f you're leaning, you're not upright," and that even a "semi-upright" state is not "upright," further contradicting Mr. Fletcher.  Ex. K at 65:12-66:2.[5]

---

[5] Elvie's alternative indefiniteness argument is moot because according to Dr. Stone, it depends on "Willow assert[ing] 'upward' is not governed by the 'top' and 'bottom' orientations (i.e., upward is towards the 'top')."  Ex. I ¶ 50.  Willow agrees with Dr. Stone that upward is defined relative to the flange, and the top and bottom of the device do not change relative their orientation when in use.  Ex. K at 55:9-19, 57:2-18, 76:2-20.

**Second**, Elvie seeks to import the "the suction force and the milk flow path" into claim 11 of the '228 Patent, which recites neither "suction force" nor a "milk flow path." In claim 11, "***milk extracted from the breast*** flows to the collection container upwardly through the milk flow path relative to a bottom of the breast contacting structure." Claim 11 separately recites "a milk flow path," but the patentee chose not to claim that the milk flow path is directed upwardly. Ex. F at 51:22. In addition, dependent claim 15 recites "a suction applied to the breast for expression of milk," *id.* at 51:36-40, giving rise to the presumption that upward movement of suction is not required by claim 11. *See Nystrom v. TREX Co.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005) ("When different words or phrases are used in separate claims, a difference in meaning is presumed.").

**Third**, Elvie's proposed construction merely substitutes words that are unnecessary and reduce clarity. For example, Elvie seeks to rename the "bottom portion" of the flange as the "lower end," but Dr. Stone confirmed that the top and bottom of the flange are always fixed, regardless of the orientation of the device. Ex. K at 55:9-19, 57:2-18, 76:2-20. Elvie's proposal also narrows the meaning of the "bottom portion" beyond its plain meaning. In Dr. Stone's annotated Figure 39A (shown below), he seeks to limit the "bottom portion (lower end) of the flange" to only the very lowest end of the flange, but that is not how the claim reads.



**FIG. 39A**

11

The bottom portion is broader than just the edge of the flange.  Indeed, claim 1 of the '816 Patent merely provides that "the **bottom portion** [is] configured below the nipple receiving portion during use," and the specification states that "a valve or flap [522] may … extend radially inwardly from the **bottom portion** of breast contact member 122."  Ex. A at 50:58-60, 42:30-32.  Thus, the bottom portion refers to any portion or region that is below the nipple receiving portion during use.  The specifications' figures and corresponding teachings convey this to a POSA, as Dr. Stone was readily able to understand through his annotated figures.  *See* Ex. K at 61:13-62:16.

Similarly, Elvie's construction reduces clarity in the claim term by substituting the words "away from" for "relative to."  When the claim is read as a whole, the term "relative to" the bottom of the flange, is easily understood and provides a point of reference for determining upward flow, while the substitution of "away from" adds unnecessary confusion about what that means absent any support in the specification.  *See SpaceTime3D, Inc. v. Samsung Elecs. Co.*, No. 2:19-cv-00372-JRG, 2020 WL 7183538, at *12 (E.D. Tex. Dec. 7, 2020) ("[W]here additional language may be unduly limiting, confusing, or redundant, it is in a court's power to determine that no construction is necessary.").

**C.**    **"contained within" ('624 Patent, claim 1; '619 Patent, claim 1; '229 Patent, claim 1) / "contained completely within" ('816 Patent, claim 1)**

| Willow's Proposed Construction | Elvie's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "fully enclosed within" |

"Contained within" and "contained completely within" are different claim terms with different meaning and scope, but both are simple terms, each easily understood by a jury.  Elvie's proposed construction is wrong if for no other reason than it treats these two different terms as having the exact same definition.  Moreover, nowhere does the specification describe that the

pump mechanism and milk collection container are "fully enclosed within" the housing, main body, or breast pump shell.  Additionally, "fully" is not defined anywhere, even by Elvie.

Elvie's construction also seems to equate "contained" with "enclosed," but "enclosed" is narrower in scope than "contained."  *Compare* https://www.merriam-webster.com/dictionary/enclosed (enclosed means "closed in or fenced off"), *with* https://www.merriam-webster.com/dictionary/contain (contain means "to have within").  Multiple figures show that collection container 10 is not "closed in or fenced off" within the main body 34.  Ex. B, Figs. 58A-E, 59A-G.  Elvie cannot show that Willow disclaimed any configurations of "contained within" or otherwise limited the scope of the claims to "fully enclosed" embodiments.

## III.    CONSTRUCTION OF '005 PATENT CLAIM TERMS

### A.    "pump mechanism comprises two drivers that displace a flexible member to generate vacuum pressure." ('005 Patent, Claim 1)

| Willow's Proposed Construction | Elvie's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "pump mechanism comprises two drivers that displace a compressible tube to generate vacuum pressure" |

The dispute for this term hinges on whether a "flexible member" is limited to a "compressible tube."  It is not.  If the applicant wanted to use the words "compressible tube" to narrow the scope of the claim to a specific embodiment, it could have.  Willow claimed more broadly and a POSA would understand a "flexible member" to include more than one type of pump design, including for example, a diaphragm-style pump which uses a flexible member in the form of a diaphragm.  Here, the Court should find the plain and ordinary meaning is sufficient, under which a "flexible member" is any volume that be changed or compressed.  Ex. K  at 26:8-11 (per Dr. Stone, "a diaphragm pump assembly includes a volume that be changed or compressed.").  While the specification of the '005 Patent generally describes that the pump includes a flex-tube or conduit 32, the claims are not limited to such a tube.  *See* Ex. C at 9:49-52 ("Although both

portions 32S and 32L are shown as tubular portions, ***the present disclosure is not limited to such, as one or both portions could be shaped otherwise***.").

Elvie again seeks to import a specific embodiment (i.e., compressible tube) from the figures and a stray reference in a laboratory notebook. Dr. Stone's opinion rests on the erroneous premise that "[t]he only flexible member … is flex-tube 32." Ex. I ¶ 74. But that is wrong. Dr. Stone fails to cite other disclosures that are not limited to a tube. Ex. C (005) at 9:49-52 ("***the present disclosure is not limited to [a tubular shape]***"); Ex. D at 12:2-5 ("pumping regions 40, 42 [of tube 32] do not need to be in the shape of a cylindrical tube, ***or even a tube at all, but can be any volume shape that be changed/compressed***"). When confronted with these disclosures, Dr. Stone could not explain why a non-tube cannot be a flexible member—and he admitted that a diaphragm pump, for example, "includes a volume that be changed or compressed," consistent with the teachings in the specification. Ex. K at 26:8-11.

### B.    "the wireless transmitter transits pumped milk volume to the external device which displays the pumped milk volume of each breast" ('005 Patent, claim 1)

| Willow's Proposed Construction | Elvie's Proposed Construction |
|---|---|
| "the wireless transmitter transmits pumped milk volume to the external device which displays the pumped milk volume of each breast" | Indefinite |

This term should not be construed as indefinite because the word "transits" is an obvious typo that the Court can and should correct to "transmits." Courts are permitted to fix obvious and minor typographical errors in a claim if "(1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does

14

not suggest a different interpretation of the claims." *Pavo Sols. LLC v. Kingston Tech. Co., Inc.*, 35 F.4th 1367, 1373 (Fed. Cir. 2022). Both elements are met here.[6]

*First*, the word "transits" appears only in claim 1 of the '005 Patent—not in the specification. *See generally* Ex. C. The context of the claim indicates that the verb should read "transmits." Ex. C at 28:35-38 ("the wireless transmitter [*transmits*] pumped milk volume to the external device which displays the pumped milk volume of each breast"). The specification confirms this understanding because it discloses wireless communication methods to relay volume and usage information from the pump to a user's smartphone, including through the *transmission* of data. Ex. C at 24:49-25:14.

*Second*, the prosecution history does not suggest a different interpretation of "transits." The term was used twice in the claims during prosecution but was not substantively argued by Willow or the examiner (Ex. O), indicating the applicant made a typographical error.

### C.    "the breast pump automatically senses letdown" ('005 Patent, claim 2)

| Willow's Proposed Construction | Elvie's Proposed Construction |
|---|---|
| Plain and Ordinary meaning | "the breast pump senses letdown via actuators and a compressible tube" |

Claim 1 of the '005 Patent recites "[a]n automated system for controlling pumping cycles to pump milk from a human breast, the system comprising: a breast pump configured to fit within a bra …." Ex. C at 28:2-4. The recited breast pump includes various components, including a chassis, an outer shell, a pump mechanism, a battery, a sensor, and a removeable breast contacting structure. *Id*. at 28:6-17. Claim 2 then recites "[t]he automated system of claim 1, wherein *the breast pump* automatically senses letdown." *Id*. at 28:42-43. In claim 1, the "pump mechanism" is just one of numerous components comprising the "breast pump" that senses letdown.

---

[6] Neither Dr. Stone nor Mr. Fletcher provide any opinion as to the meaning of this term.

Elvie's construction gratuitously adds the phrase "via actuators and a compressible tube," importing its flawed definition of "pump mechanism." Thus, Elvie's construction is **two degrees** removed from a proper construction—first, it imports into "pump mechanism" a specific embodiment involving a compressible tube, and second, it requires that the "pump mechanism" senses letdown, even though the claim contains no such requirement.

Dr. Stone does not confront the claim language, and instead cherry-picks embodiments from the specification and the lab notebooks where the pump is used in letdown detection. Ex. I ¶¶ 81-85. But it is improper to import embodiments from the specification absent a clear disavowal of claim scope—and here there is none.

### D.    "chassis" ('005 Patent, claim 1)

| Willow's Proposed Construction | Elvie's Proposed Construction |
|---|---|
| Plain and Ordinary meaning | "a component on which other parts are assembled, exclusive of the case or exterior of the device" |

"Chassis" should be construed according to its plain meaning—a component on which other parts are assembled. Claim 1 of the '005 Patent recites, among other components, "a breast pump configured to fit within a bra, the breast pump including: *a chassis*; an outer shell attached to the chassis; a pump mechanism attached to the chassis between the outer shell and chassis; a battery contained between the outer shell and chassis; [and] a circuit board contained between the outer shell and chassis." Ex. C at 28:4-11. Nowhere does claim 1 or the '005 Patent specification state that the chassis must exclude "the case or exterior of the device."

Dr. Stone once again isolates specific embodiments to limit plain and ordinary meaning. Ex. I ¶ 105 (showing Figs. 2-3 with the chassis removed from the outer shell); *id*. ¶ 106 (showing an exploded view with the chassis separated from the housing). But these are merely non-limiting figures—and "drawings in a patent need not illustrate the full scope of the invention." *Arlington*

*Industries, Inc. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246, 1254 (Fed. Cir. 2011). Dr. Stone undermines his opinion by citing ***conflicting*** definitions, one in which "chassis" is "the supporting frame of a structure" and another in which it is "the frame and working parts (of an automobile or electronic device) exclusive of the body or housing." Ex. I ¶ 107. The Court should thus reject Elvie's narrowing construction and find plain meaning sufficient.

## IV.    CONSTRUCTION OF '619 PATENT CLAIM TERMS

### A.    "the non-contact pressure sensor adjacent the nipple receiving portion" ('619 Patent, claim 1)

| Willow's Proposed Construction | Elvie's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning | Indefinite |

The term "non-contact pressure sensor adjacent the nipple receiving portion" is not indefinite when viewed in the context of the specification. Dr. Stone understands what a non-contact pressure sensor and nipple receiving portion are, as well as where they are located. Ex. I ¶ 114; Ex. P. "Adjacent" seems to throw off Dr. Stone. But adjacent means next to, and a POSA would understand this from the '619 Patent, which provides various examples of configurations where the non-contact pressure sensor is *adjacent or next to* the nipple receiving portion of a skin contact member. For example, Figure 20 describes that "sensor 54 is located nearby where the tip of the nipple 3 of the breast 2 is located to determine actual pressure being exposed to the breast 2 / nipple 3." Ex. E, '619 Patent at 29:51-53. As shown, non-contact pressure sensor 54 (annotated in blue below) is next to nipple receiving portion 112 (annotated in green below).

17



**FIG. 20**

Figures 21A-21B also show the relative position of the non-contact pressure sensor, which may appear at locations 350 A, 350B, 350C, and 350D. In each location, the non-contact pressure sensor is adjacent or next to the nipple receiving portion 112.

Dr. Stone further argues that because "adjacent" is defined as "may or may not imply contact," a POSA would not know whether "adjacent require[s] contact between the non-contact pressure sensor and the nipple receiving portion." Ex. I ¶¶ 113, 117. But that is wrong as a matter of law—"the intrinsic record supports several definitions of a term, [thus] the term may be construed to encompass all such consistent meanings." *Wasica Fin. GMBH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1281 (Fed. Cir. 2017). The fact "[t]hat the claim is drafted broadly enough to cover multiple embodiments does not render the claim indefinite." *Cywee Grp., Ltd. v. Huawei Device Co.*, No. 2:17-cv-00495-WCB-RSP, 2018 WL 6419484, at *20 (E.D. Tex. Dec. 6, 2018).

## V.    CONSTRUCTION OF '816 PATENT CLAIM TERMS

### A.    "the pumping mechanism is associated with the rigid nipple receiving portion" ('816 Patent, claim 1)

| Willow's Proposed Construction | Elvie's Proposed Construction |
|---|---|
| Plain and ordinary meaning | Indefinite |

When viewed in the context of the intrinsic record, this term is not indefinite and should receive its plain and ordinary meaning. Claim 1 of the '816 Patent recites "… wherein **the pumping mechanism is associated with the rigid nipple receiving portion** [of a flange configured to contact and form a seal with the breast] and the pumping mechanism is configured to create a suction force from the rigid nipple receiving portion." Ex. A at 50:45-67. When asked, Dr. Strone was able to identify both the pumping mechanism and rigid nipple receiving portion in Figure 20, which is an exemplary embodiment showing their association. Ex. P (reproduced below).



Pleading ignorance about a POSA's understanding of "associated," Dr. Stone ignores the relevant passages of the specification (e.g., Ex. A at 25:46-50; Fig. 20), which inform the proper understanding of this term, and instead cites a dictionary definition. But he fails to apply that definition (i.e., connected with, combined with, or joined with) within the context of the disclosures found in the '816 Patent. Ex. I ¶¶ 142-43. Again, Figure 20 shows that the pumping mechanism (of which tube 32 is a part) is either connected with, combined with, or joined with the

19

rigid nipple receiving portion (112). In other embodiments, the tube 32 and rigid nipple receiving portion 112 are "closely connected (as in function or office)" with each other. *See* Ex. A at 25:46-50. Dr. Stone also argues that "associated with" is not defined in the specification or prosecution history, Ex. I ¶¶ 140-41, but that is not determinative of indefiniteness. *See Joao Control & Monitoring Sys., LLC v. Protect Am., Inc.*, No. 1-14-CV-134-LY, 2015 WL 4937464, at *8 (W.D. Tex. Aug. 18, 2015) ("The words 'associated with' are a common English phrase with a clear meaning and connotation, and the fact that the phrase is used in a patent claim does not somehow render the words ambiguous.").

## VI.    CONSTRUCTION OF '229 PATENT CLAIM TERMS

### A.    "a latch suction is maintained throughout the pumping session" ('229 Patent, claim 1)

| Willow's Proposed Construction | Elvie's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "suction is more than zero during the entire pumping session" |

Willow substantially agrees in principle with the first part of Elvie's proposed construction: Under the plain meaning, "a latch suction" should be defined as "a suction that is more than zero" as defined in the specification consistent with its plain and ordinary meaning, which is a minimum vacuum level established when the pump is attached to the breast—i.e., a pressure which is below atmospheric pressure. Ex. A at 16:58-62. The agreement stops there. Elvie's attempt to unduly narrow the claim term by interpreting "throughout" to mean "during the entire" should be rejected.

"During the entire pumping session," as Elvie proposes, and "throughout the pumping session mean," as the claim term reads, mean different things. Mr. Fletcher used the term "throughout the pumping session" in his declaration when describing so-called "pull and release" pumping methods, indicating he understands the phrase as written. Ex. J, Fletcher Decl. ¶ 89. And he confirmed during his deposition that "during the entire pumping session" means "constantly

from start to finish." Ex. L at 142:12-14. While Willow agrees that "throughout" means from start to finish, it does not mean **constantly** from start to finish. For example, if one were to say that counsel was sneezing **throughout** the *Markman* hearing, it does not mean that they were literally sneezing one long sneeze the entire time or one sneeze right after the next the entire time, but instead that they were sneezing frequently from the start of the hearing to the end.

Further, Elvie ignores that the claim merely requires "**a** latch suction" to be "maintained throughout a pumping session." Ex. B at 53:22-23. The claim does not require that **the** latch suction needs to be maintained, meaning it is only one, and necessarily that one must be maintained in its entirety throughout. The specification also teaches a POSA that one latch suction does not need to be maintained during the entire pumping session, because the pressure can go to zero, suggesting that a "latch" was maintained even though suction went to zero. *Id*. at 3:58-61. This reinforces that a threshold level of "latch suction" need not be maintained during the **entire** pumping session; instead, "**a** latch suction" must be "maintained throughout the pumping session." The limitation is satisfied so long as a suction more than zero is maintained during the pumping session.

### B. "the milk collection container is configured about the pump mechanism" ('229 Patent, claim 5) / "the milk collection container is configured adjacent the pump mechanism" ('229 Patent, claim 9)

| Willow's Proposed Construction | Elvie's Proposed Construction |
|---|---|
| Plain and ordinary meaning | Indefinite |

Claims 5 and 9 of the '229 Patent are not indefinite merely because they refer to relative locations between the pump mechanism and milk collection container. The '229 Patent specification provides numerous examples that show the relationship between the pumping mechanism and the collection container, and how "about" and "adjacent" should be considered in light of the disclosure. *See* Ex. B at 19:54-57, 36:12-16, Figures 1-6, 8A, 8B, 9, 12, 24-28F. For

example, the specification describes the spatial relationship as "***the container 60 can be contained within the housing 34, about or adjacent pumping structure***, or the container can be positioned between the pumping structure or housing and the user's breast." *Id*. at 36:10-16; Fig. 1.

Dr. Stone's indefiniteness argument is that "[t]here are numerous different container configurations in numerous different positions relative to a pumping mechanism," and thus a POSA would not know whether "adjacent require[s] contact between the non-contact pressure sensor and the nipple receiving portion." Ex. I ¶¶ 132-35. But Dr. Stone again defines "adjacent" to mean "may or may not imply contact," *Id*. ¶ 135, and consistent with the explanation above, claims, as a matter of law, are not indefinite merely because they encompass multiple embodiments, contrary to Dr. Stone's opinions. *Cywee*, 2018 WL 6419484, at *20.

## VII.    CONSTRUCTION OF 'D995 PATENT CLAIM TERMS

### A.    "The ornamental design for a breast pump, as shown and described"

| Willow's Proposed Construction | Elvie's Proposed Construction |
|---|---|
| Plain and Ordinary meaning<br><br>Alternatively, "a breast pump of a certain design as shown in Figures 1-7." | Indefinite; Alternatively, the ornamental design for a breast pump including:<br>a uniform and smooth front surface (see Figs. 1-6) that, when viewed from the left or right side (see Figs. 3 & 4), has a flat upper area and a rounded bottom area to fit comfortably into a bra and to mimic the natural shape of a breast; when viewed from the front (see Figs. 6, 7), has an oval shape to fit comfortably into a bra and to mimic the natural shape of a breast; and a flat rear surface when viewed from the top, bottom, right, and left (see Figs. 2-5). |

A design is better represented by an illustration "than it could be by any description." *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 679 (Fed. Cir. 2008) (internal quotations omitted). Thus, the "preferable course ordinarily will be for a district court not to attempt to 'construe' a design patent claim by providing a detailed verbal description of the claimed design." *Id*. This principle applies to the design claimed in the 'D995 Patent.

22

### 1. The claimed features are ornamental, not functional, and thus require no verbal description

While the Federal Circuit has explained that certain claim scope issues, including "the distinction between features of the claimed design that are ornamental and those that are purely functional," may benefit from verbal or written guidance, that is ***not*** the case here. *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1333 (Fed. Cir. 2015).

The features of the design claimed in the 'D995 Patent are ornamental rather than functional because alternative designs exist that would allow a breast pump "to fit comfortably into a bra and to mimic the natural shape of a breast," which Elvie alleges is the function of the claimed breast pump.[7]  "[I]f other designs could produce the same or similar functional capabilities, the design of the article in question is likely ornamental, not functional." *Id*. at 1330.

After Willow released its first in-bra wearable breast pump for sale, numerous other in-bra wearable breast pumps entered the market. Many of these in-bra wearable breast pumps have diverse shapes and configurations, all intended to fit comfortably into a bra and mimic certain breast shapes. Mr. Tim Fletcher, Elvie's design expert, who is not an expert in design patent law (Ex. L at 37:6-13), testified at his deposition that he had not analyzed ***any*** in-bra wearable breast pumps for his claim construction opinion, confirming that he had not considered whether any alternative designs are available. *Id*. at 99:6-13. Many are. Despite this shortcoming in his analysis, Mr. Fletcher singled out and opined that "the rounded bottom area and oval-shaped profile are functional because they are necessary for a breast pump to fit comfortably into a bra and mimic the natural shape of a breast." Ex. J ¶¶ 71-72, 79-80. Mr. Fletcher's opinion, however,

---

[7] Willow disagrees with Elvie's formulation of the alleged function.  But even under Elvie's formulation, alternative designs are available to produce the same or similar functional capabilities.

is conclusory and unsupportable. The Court does not need to construe the claim because the claimed features are "ornamental rather than purely functional." *See Ethicon*, 796 F.3d at 1333.

### 2. *Elvie's proposed verbal description interjects ambiguity and is unhelpful to the Court or jury*

The Court should also reject Mr. Fletcher's proposed verbal description because it interjects ambiguity into an already clear design, and thus is unhelpful to the Court or jury. In addition, the proposed verbal description increases "the risk of placing undue emphasis on particular features of the design and the risk that a finder of fact will focus on each individual described feature in the verbal description rather than on the design as a whole." *Sport Dimension, Inc. v. Coleman Co.*, 820 F.3d 1316, 1320 (Fed. Cir. 2016). Indeed, there are multiple reasons why Mr. Fletcher's proposed verbal description should be rejected.

***First***, the proposed verbal description does not serve its intended purpose of distinguishing "between features of the claimed design that are ornamental and those that are purely functional." *See Ethicon*, 796 F.3d at 1333. As discussed above, Mr. Fletcher provides no basis to single out features that only he describes as a "rounded bottom area and oval-shaped profile," labeling them as purely functional, because as of the date of his deposition, he had not analyzed ***any*** in-bra wearable breast pump designs, including the accused Elvie Pump, the patented Willow premium pump, or any other in-bra wearable breast pump for that matter, of which there are many. Ex. L at 83:11-84:7, 85:20-86:8, 99:6-13. Also, his proposed verbal description uses the terms "uniform" and "smooth," which are undefined, ambiguous in their own right, and introduce another level of confusion around which features are considered ornamental instead of functional. Indeed, even Mr. Fletcher himself could not explain whether the terms "uniform" and "smooth" are functional or ornamental. *Id*. at 122:16-124:6.

**Second**, the proposed verbal description calls out a "flat upper area," which Mr. Fletcher identified in the figure below using blue ink pen.  But as shown in the annotated figure, the area identified by Mr. Fletcher is in fact not flat, but instead has a slight upward curve to it (a straight flat line in red between the points Mr. Fletcher denoted as the upper flat area was added to show this).  Thus, Elvie's proposed verbal description is inaccurate and misleading to the Court or jury. *See* Ex. Q.



FIG. 4

**Third**, Mr. Fletcher's proposed verbal description describes the breast pump as having an "oval shape" when viewed from the front, but not only does he not define what "oval" means, when asked what an oval shape means to him, he testified that it is "two arcs made circularly typically with two larger arcs that attach to it." Ex. L at 102:2-11.  Mr. Fletcher elaborated, stating that while some may consider "a rectangle that has fully rounded edges" as an oval, he would consider that as a "capsule" rather than an oval.  *Id.*  He went on to say that an egg shape—a shape that a jury would well understand to be an oval—is ***not*** an oval under his definition of oval. *Id.* at 102:12-14.[8]  When asked if there are other shapes that he would consider to be oval, Mr. Fletcher testified that he had not "really thought about exactly what an oval is."  *Id.* at 103:2-6.  In short,

---

[8] Mr. Fletcher's opinion is contrary to both the dictionary definition and common experience. https://www.merriam-webster.com/dictionary/oval (defining "oval" as "having the shape of an egg").

Mr. Fletcher's description of the shape is not only unhelpful, but also confounding and should be rejected.

**Last**, to justify his proposed verbal description, Mr. Fletcher argues that it would encourage a factfinder to notice "that the claimed design has a rounded bottom surface that curves until it meets the flat rear surface." Ex. J ¶ 73. However, his proposed verbal description does not even describe the surface that meets the "flat rear surface." The figure below shows the surfaces identified in the proposed verbal description—the "front surface" and the "flat rear surface"—both of which are labeled by Mr. Fletcher using a blue ink pen. Notably, the surface that meets the "flat rear surface," i.e., the surface that Mr. Fletcher wants to encourage factfinders to notice, is not identified in the figure below, nor is it described in the proposed verbal description. *See* Ex. R.



FIG. 4

In sum, Mr. Fletcher's proposed verbal description is not well supported, interjects ambiguity into an unduly limiting verbal description, and ultimately is unhelpful (if not damaging) to a jury's understanding. It also increases the risk of placing undue emphasis on particular features of the design and the risk that a factfinder will focus on each separate, individually-described feature in the verbal description instead of the design as a whole. Figures 1-7 of the 'D995 Patent, on the other hand, clearly depict the claimed design. The Court should therefore

reject Mr. Fletcher's proposed verbal description as set forth by Elvie and give the claim of the 'D995 Patent its plain and ordinary meaning based on the drawings themselves.

### 3.    The drawings describe the scope of the design with reasonable certainty

Contrary to Elvie's assertion, Figures 1-7 of the 'D995 Patent are consistent with each other, and they inform those skilled in the art, viewing the design as would an ordinary observer, about the scope of the design with reasonable certainty. Thus, the design claimed in the 'D995 Patent satisfies the definiteness requirement under 35 U.S.C. § 112. *See In re Maatita*, 900 F.3d 1369, 1377 (Fed. Cir. 2018). Notably, Figures 1-7 of the 'D995 Patent depict one single ornamental design of a breast pump, and the overall shape of the claimed breast pump does not change across these figures. Ex. L at 90:2-7. Mr. Fletcher agrees. *Id*. Indeed, Mr. Fletcher had no problem ascertaining the overall shape of the claimed breast pump and provided a verbal description of the design in both his declaration (Ex. J ¶70) and element-by-element at his deposition. Ex. L at 90:2-7, 107:21-110:6, 118:14-119:17, 126:12-127:15, Exs. Q, R.

As discussed in more detail below, the alleged inconsistencies that Mr. Fletcher relies on for indefiniteness and points to in his declaration are manufactured and unsupported by the teachings of the 'D995 Patent. More importantly, any inconsistencies between drawings, of which there are none here, do not render a claimed design indefinite if they "do not preclude the overall understanding of the drawing as a whole." *In re Maatita*, 900 F.3d at 1375-76. Mr. Fletcher does not contend that any of the alleged inconsistencies precluded him from having an overall understanding of the drawing as a whole. Thus, even if there were inconsistencies between the drawings, inconsistencies are immaterial to the indefiniteness analysis.

Mr. Fletcher's indefiniteness challenges are without merit. ***First***, contrary to Mr. Fletcher's assertion, the depictions of the outer edges shown in Figures 6 and 7 are consistent with the depictions of the outer edges shown in Figures 1-5 of the 'D995 Patent. Using annotated Figure 2

below as an example, Mr. Fletcher testified that he understood the dashed line annotated in red to mean that the front portion of the breast pump must extend at least to that dashed line. Ex. L at 52:20-53:7.  In this case, when viewed from the front, the outer edge of the breast pump would be seen as a solid line, which is consistent with Figure 6 of the 'D995 Patent.  Mr. Fletcher also testified that he understood the front portion of the breast bump may extend beyond the dashed line annotated in red.  *Id*. at 52:20-54:5.  For example, the front portion of the breast bump may extend to the solid line annotated in red in Figure 2 below.  *Id*.  In such a case, while the extended portion would not be visible in the front view of the breast pump, Mr. Fletcher testified that the "intersection" (annotated below in blue ink) between the extended portion and the outer edge of the breast pump would be seen as a solid line, which is again consistent with Figure 6 of the 'D995 Patent. *Id*. at 54:18-56:13.  Therefore, even though certain boundaries are depicted as dashed lines in Figures 1-5, the depictions are consistent with the depiction of the outer edge as shown in Figure 6.  The same is true with respect to Figure 7.  *See* Ex. L at 58:15-59:12; Ex. S.



FIG. 2

***Second***, Mr. Fletcher incorrectly argues that Figure 1 of the 'D995 Patent is missing a depiction of a space between the front and back portions of the breast pump.  Figure 1 is a "perspective view" of the breast pump, and in a perspective view, the apparent size of an object decreases as its distance from the viewer increases.  This is consistent with the depiction shown in

Figure 1 and is confirmed by Mr. Fletcher's own annotation shown on page 17 of his declaration (reproduced below).  Notably, Mr. Fletcher's own annotation shows that the distance between the dashed lines he annotated in red and blue (between which exists the alleged missing space) decreases towards the left and right sides of the view to the point where the two dashed lines eventually converge.  Thus, the alleged missing space is not visible on the left and right sides of this perspective view.  Further, even if the alleged missing space were visible, the lack of depiction of this alleged missing space would not be sufficient to preclude a skilled artisan from gaining an overall understanding of the drawing as a whole, and thus is not sufficient to render the claimed design indefinite.  *In re Maatita*, 900 F.3d at 1375-76.



Ex. J at 17 (annotated to include enlarged view).

**Third**, contrary to Mr. Fletcher assertion, there is no missing element in Figures 3 and 6. Indeed, the alleged missing element Mr. Fletcher points to on page 19 of his declaration is depicted entirely in dashed lines, thus "form no part of the claimed design." Ex. G, 'D995 Patent at 1.  Even Mr. Fletcher has to acknowledge that if the dashed lines were not included in the drawings, he would "have a good understanding of what that surface would look like." Ex. L at 73:9-18.  Thus, Mr. Fletcher's assertion is baseless, as he relies entirely on dashed lines that "form no part of the claimed design" to manufacture an alleged inconsistency between the figures.

## VIII.   CONSTRUCTION OF 'D625 PATENT CLAIM TERMS

### A.    "The ornamental design for a breast pump, as shown and described"

| Willow's Proposed Construction | Elvie's Proposed Construction |
|---|---|
| Plain and Ordinary meaning<br><br>Alternatively, "a breast pump of a certain design as shown in Figures 1 7." | The ornamental design for a breast pump, including: a uniform and smooth front surface (see Figs. 1-6) that, when viewed from the left or right side (see Figs. 3 & 4), has a flat upper area and a rounded bottom area to fit comfortably into a bra and to mimic the natural shape of a breast; and when viewed from the front (see Figs. 6, 7), has an oval shape to fit comfortably into a bra and to mimic the natural shape of a breast. |

The verbal description of the 'D625 Patent is identical to that of the 'D995 Patent, except for the description of the "flat rear surface," which is not claimed by the 'D625 Patent. Ex. J ¶¶ 70, 78; Ex. L at 124:7-125:3. Thus, the verbal description of the 'D625 Patent has the same deficiencies as described above for the 'D995 Patent and should be rejected for the same reasons.

In addition, to justify the proposed verbal description of the 'D625 Patent, Mr. Fletcher again argues that it would encourage a factfinder to notice "that the claimed design has a rounded bottom surface that curves until it meets the flat rear surface." Ex. J ¶ 81. This raises an even greater concern because unlike the 'D995 Patent, the 'D625 Patent does not claim the back portion of the breast pump, and therefore the claimed design does not even have the alleged "rounded bottom surface that curves until it meets the flat rear surface."

Date: August 8, 2024                    Respectfully submitted,


                                        */s/ Timothy S. Durst*

                                        **O'MELVENY & MYERS LLP**
                                        Timothy S. Durst (TX #00786924)
                                        tdurst@omm.com
                                        Cason Garrett Cole (TX #24109741)
                                        ccole@omm.com
                                        2801 North Harwood Street, Suite 1600
                                        Dallas, TX 75201
                                        Telephone: (972) 360-1900
                                        Facsimile: (972) 360-1901

                                        Robert F. Shaffer (admitted *pro hac vice*)
                                        rshaffer@omm.com
                                        Jason Fountain (admitted *pro hac vice*)
                                        jfountain@omm.com
                                        Miao Liu (admitted *pro hac vice*)
                                        mliu@omm.com
                                        1625 Eye St., NW
                                        Washington, DC 20006
                                        Telephone: (202) 383-5300
                                        Facsimile: (202) 383-5414

                                        Carolyn S. Wall (admitted pro hac vice)
                                        cwall@omm.com
                                        1301 Avenue of the Americas
                                        Suite 1700
                                        New York, NY 10019-6022
                                        Telephone: (212) 326-2000
                                        Facsimile: (212) 326-2061

                                        Laura Burson (TX # 24091995)
                                        lburson@omm.com
                                        400 South Hope St
                                        Los Angeles, CA 90071
                                        Telephone: (213) 430-6000
                                        Facsimile: (213) 430-6407

                                        ***Attorneys for Plaintiff Willow Innovations, Inc.***

31

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that counsel of record who are deemed to have consented

to electronic services are being served with a copy of this document via the Court's CM/ECF

system per Local Rule CV-5(a)(3) on August 8, 2024.

/s/ <i>Timothy S. Durst</i>
